UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------x
HERMA ROBINSON,

        Plaintiff,

        v.

ZURICH NORTH AMERICA INSURANCE COMPANY,
and JENNIFER ROBBIE aider and abettor,

        Defendants.
------------------------------------------------------------x

No. 10-CIV-3926 (JFB) (AKT)

**DECLARATION OF
JENNIFER ROBBIE**

    I, **JENNIFER ROBBIE,** being duly sworn, declare under penalty of perjury that the foregoing is true and correct:

    1.    I am currently employed as Assistant Vice President, Proposition Management and Development, with Zurich North American Insurance Company ("Zurich"). From August 2007 through August 2009, I held the position of Team Manager for Transactional Audits. I am fully familiar with the facts set forth in this Declaration, which I offer in support of Defendants' Motion for Summary Judgment and to supplement my deposition testimony.

    2.    I began supervising plaintiff, Herma Robinson ("Robinson"), in or around August of 2007. She previously reported to Joseph Kostkowski, who was my direct supervisor from August 2007 until approximately April 30, 2008.

    3.    In 2007, when I became Robinson's supervisor, Zurich underwent significant changes. The company moved away from a stringent checklist of audit criteria and placed more emphasis on the quality of the files. As a result, the auditors had to rely on their own experience, common sense, and judgment when analyzing the quality of specific aspects of a file.

4.  In addition to this change, the company also implemented a more demanding performance management culture. Managers were advised that they needed to document performance deficiencies and utilize corrective action for underperforming employees, rather than tolerating mediocre performance ratings year after year.

5.  Shortly after I became Robinson's supervisor, I noticed significant deficiencies in her performance. First, she did not provide enough detail when explaining the basis for her audit scores and her communications were curt and unprofessional. As a result, the field claims employees often contacted me and expressed their frustration at not understanding Robinson's audits. I was concerned about this because the field employees' performance reviews are affected by the scores that they received, and it was important that they understand the basis behind a low score. Further, these employees cannot improve future audits if they do not understand the reasons behind their low scores.

6.  After receiving numerous complaints from the field claims employees, I contacted Kostkowski to discuss a strategy for improving Robinson's communications style. I learned from Kostkowski that the issues with Robinson's communications were not new, and that he had received similar complaints in the past. In fact, Kostkowski had transferred Robinson to transactional audits because, among other things, he believed that these audits involved less communications with the field claims employees than the closed file audits did. However, Kostkowski was mistaken; the transactional audits still involved significant communications with the field claims employees.

7.  Kostkowski and I decided that Robinson might benefit from taking an on-line communications course offered through Zurich. I also decided to assign Robinson to the

Construction Defect Leakage Reduction audits, which required less interaction with the field professionals.

8. When I suggested the communications course to Robinson, she immediately became defensive. Robinson did not, however, raise any concerns about discrimination or mistreatment on the basis of her race, age, or color. Her complaints to me always focused on her dissatisfaction with her performance feedback.

9. At around the same time, I also noticed that Robinson's calibrations were inconsistent and that other auditors frequently disagreed with the findings in her audits. It appeared to me that Robinson did not understand basic concepts and, as a result, made several mistakes when scoring files. In addition, Robinson emphasized form over substance and consequently gave low scores when a claims professional did not include unimportant minutia in their files.

10. I spoke to Robinson and met with her on several occasions to assist her with her performance; however, Robinson was not receptive to my suggestions and often became defensive when I spoke to her. In mid-October 2007, I also decided that it would be helpful for Robinson to create an action plan identifying the skills she needed to improve on and suggesting her own ideas for improvement. Robinson refused to draft a plan and told me that it was "my job" to create it for her.

11. When she refused to create this plan, I contacted Catherine Spera, the Human Resources representative for my district, and asked her for guidance. I was concerned because Robinson became defensive whenever I broached the topic of her performance, making it difficult for me to address and help her improve the deficiencies in her performance.

3

12. Spera informed me that I should be very clear about my expectations for Robinson's performance. Shortly thereafter, I gave Robinson the plan that I had created for her. Among other things, the plan required Robinson to send her completed audits to me every Friday so that I would have an opportunity to review the audits and provide Robinson with feedback before the audits were finalized.

13. The action plan did not improve Robinson's performance. As a result, Kostkowski and I jointly gave Robinson a "partially meets expectations" performance rating for 2007 and discussed issuing a verbal warning to Robinson. I thereafter worked with Spera to draft the verbal warning, which I issued to Robinson at the same time as I gave her 2007 year-end performance review.

14. Because I was going to give Robinson her performance evaluation and a verbal warning, I asked her to meet me in person in the Rocky Hill, Connecticut, office so that we could discuss any concerns that she might have had. I felt that it was most appropriate for me to discuss Robinson's verbal warning and negative performance evaluation over the telephone.

15. Robinson met with me on March 25, 2008, in Rocky Hill. During this meeting, I gave Robinson her year-end performance evaluation and verbal warning and asked her to review both while I stepped out of the office. When I returned, I asked whether she had any questions or comments. She said that she did not, and then stormed out of the room. The meeting was very short because Robinson did not provide me with an opportunity to discuss her performance.

16. Robinson's performance did not improve after receiving the verbal warning. Among other things, her audit accuracy score was at 43% compliance, well below Zurich's goal of 93% compliance. Despite these deficiencies, it appeared to me that Robinson did not want to improve her performance. She was still defensive and she did not comply with very basic

requirements from her verbal warning, such as copying me on her email communications to the claims field employees.

17.  By this time, Kostkowski had been transferred to another position and Jenny Killgore ("Killgore") became my direct supervisor. I discussed Robinson's continued performance deficiencies with Killgore, and she agreed with me that a written warning was warranted. I issued the written warning to Robinson on May 8, 2008.

18.  When Robinson's performance still did not improve, after consulting with Spera, I placed her on a 45-day probation period. During this probationary period, Robinson took a medical leave of absence. While she was out on leave, Killgore, Spera, and I discussed extending Robinson's probation for a full forty-five days after she returned from leave. We believed that this would provide Robinson with a fresh start and a full opportunity to improve her performance. We informed Robinson of the extended probation on October 1, 2008, when she returned from leave. To assist with her transition back to work, I arranged for Robinson to engage in practice calibration exercises that were not scored and did not impact her performance reviews.

19.  After the 45-day probation ended, Robinson still had not improved her performance at all. At this time, Killgore suggested that the team re-audit all of Robinson's work and discuss next steps after this re-audit, which we referred to as the "100% re-audit." I disagreed with Killgore because it was a strain for the other employees to take on this additional workload. However, I complied with the directive because it came from my direct supervisor. I informed Robinson about the 100% reaudit on December 9, 2008. The 100% reaudit revealed that Robinson's audits hovered around a 50% accuracy rate, well below Zurich's 93% expectation.

20. Shortly after the 100% reaudit, Zurich issued a nationally required litigation skills test to its claims adjusters and auditors. Because Robinson was responsible for auditing the adjusters in this very area, she was expected to have mastered this topic. I was shocked to learn that Robinson not only failed the test, but also received the second lowest score in the company. This worried me because Robinson was conducting audits in this area, and her audits impacted numerous claims adjusters' performance results.

21. Despite the verbal and written warnings, the extended probationary period, and the 100% reaudit, Robinson's performance had not improved. As a result, in or about November 2008, Killgore and I jointly decided to terminate Robinson's employment. However, we did not implement her termination immediately because we did not want to discharge anyone during the holiday season and because we were informed that there were ongoing negotiations between Robinson attorneys and Zurich. We terminated Robinson's employment only after learning that the negotiations had been unsuccessful.

22. Spera and I met with Robinson on August 31, 2009, to inform her of her termination. When we informed her of her discharge, she stood up and told us to "to look at her" because we were "going to see her again." I felt threatened by this statement, which I perceived as a physical threat. Robinson then started clapping and twirling around the room as she departed.

23. During her employment, Robinson never once mentioned to me that she felt she was being treated differently because of her race, age, color, or any other protected category.

24. I read in Plaintiff's Complaint that she believes another auditor who also reported to me, Deborah Conley, was treated differently because of her age. I did not treat Conley any differently than any other auditor. Further, Conley is only two months younger than Robinson is.

6

**Exhibits To My Declaration**

25. Attached as "Exhibit A" is a true and correct copy of an email I sent to Robinson on September 10, 2007, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH002595-2596.

26. Attached as "Exhibit B" is a true and correct copy of an email I sent to Robinson on September 11, 2007, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH002598-2600.

27. Attached as "Exhibit C" is a true and correct copy of an email I sent to Robinson on October 11, 2007, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH002609-2610.

28. Attached as "Exhibit D" is a true and correct copy of an email I sent to Robinson on November 8, 2007, which I have been advised was produced during discovery and identified by Bates No. ZURICH002613.

29. Attached as "Exhibit E" is a true and correct copy of an email I sent to myself on November 12, 2007 documenting a conversation I had with Robinson on that date, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH002614-2615.

30. Attached as "Exhibit F" is a true and correct copy of an email I sent to Robinson on November 19, 2007, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH002616-2619.

31. Attached as "Exhibit G" is a true and correct copy of an email I sent to Robinson on August 29, 2007, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH002626-2627.

32. Attached as "Exhibit H" is a true and correct copy of an email I sent to Robinson on September 10, 2007, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH002631-2632.

33. Attached as "Exhibit I" is a true and correct copy of an email I sent to Robinson on October 3, 2007, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH002648-2650.

34. Attached as "Exhibit J" is a true and correct copy of an email I sent to Robinson on March 19, 2008, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH002678-2681.

35. Attached as "Exhibit K" is a true and correct copy of an email I sent to Robinson on April 9, 2008, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH002789.

36. Attached as "Exhibit L" is a true and correct copy of an email I sent to Robinson on December 9, 2008, which I have been advised was produced during discovery and identified by Bates No. ZURICH02826.

37. Attached as "Exhibit M" is a true and correct copy of an email I sent to myself on April 14, 2008 documenting a conversation I had with Robinson, which I have been advised was produced during discovery and identified by Bates No. ZURICH003006.

38. Attached as "Exhibit N" is a true and correct copy of an email I sent to Robinson on April 3, 2008, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH003143-003146.

39. Attached as "Exhibit O" is a true and correct copy of an email I received from Robinson on August 24, 2007, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH003149-3150.

40. Attached as "Exhibit P" is a true and correct copy of an email I received from Robinson on September 21, 2007, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH003169-3170.

41. Attached as "Exhibit Q" is a true and correct copy of an email I sent to Robinson on October 23, 2007, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH003163-3165.

42. Attached as "Exhibit R" is a true and correct copy of an email I sent to Spera on October 24, 2007, which I have been advised was produced during discovery and identified with Bates No. ZURICH003180, and marked as Exhibit 3 at the Deposition of Catherine Spera, taken on June 30, 2011.

43. Attached as "Exhibit S" is a true and correct copy of an email I received from Joseph Kostkowski on October 29, 2007, which I have been advised was produced during discovery and identified by Bates No. ZURICH003183.

44. Attached as "Exhibit T" is a true and correct copy of an email I sent to myself on November 29, 2007 documenting a meeting I had with Robinson, which I have been advised was produced during discovery and identified by Bates No. ZURICH003189

45. Attached as "Exhibit U" is a true and correct copy of an email I sent to myself on May 2, 2008 documenting a complaint I received regarding Robinson's communications style, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH003190-3191.

46. Attached as "Exhibit V" is a true and correct copy of an email I sent to myself on May 2, 2008, documenting a conversation I had with Robinson, which I have been advised was produced during discovery and identified by Bates No. ZURICH003193.

47. Attached as "Exhibit W " is a true and correct copy of an email I sent to myself on March 31, 2008, documenting a conversation I had with Robinson, which I have been advised was produced during discovery and identified by Bates No. ZURICH003196.

48. Attached as "Exhibit X " is a true and correct copy of an email I sent to myself on April 15, 2008, documenting my review of Robinson's work, which I have been advised was produced during discovery and identified by Bates No. ZURICH003197

49. Attached as "Exhibit Y" is a true and correct copy of an email I sent to myself on April 17, 2008, documenting a conversation I had with Robinson, which I have been advised was produced during discovery and identified by Bates No.ZURICH003198.

50. Attached as "Exhibit Z " is a true and correct copy of an email I sent to myself on May 13, 2008 documenting a conversation with Michelle Morbach regarding Robinson, which I have been advised was produced during discovery and identified by Bates No. ZURICH003201

51. Attached as "Exhibit AA" is a true and correct copy of an email I sent to Killgore on February 11, 2009, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH003603-3604.

52. Attached as "Exhibit BB" is a true and correct copy of an email I received from Janet Grantner on August 20, 2007, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH003723-3725.

53. Attached as "Exhibit CC " is a true and correct copy of an email I sent to Kostkowski on August 23, 2007, which I have been advised was produced during discovery and

identified by Bates Nos. ZURICH003729-3731, and marked as Exhibit 6 during my deposition, taken on May 18, 2011.

54. Attached as "Exhibit DD" is a true and correct copy of an email I sent to Robinson on October 15, 2007, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH003740-3744.

55. Attached as "Exhibit EE" is a true and correct copy of an email I sent to Robinson on March 28, 2007, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH004244-4248.

56. Attached as "Exhibit FF" is a true and correct copy of an email I received from Pamela Burris on April 4, 2008, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH004320-4321.

57. Attached as "Exhibit GG" is a true and correct copy of an email I received from Robinson on April 4, 2008, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH004335-4337.

58. Attached as "Exhibit HH" is a true and correct copy of an email I sent to Robinson, dated April 4, 2008, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH004342-4343.

59. Attached as "Exhibit II" is a true and correct copy of an email I sent to Robinson on April 4, 2008, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH004345-4346.

60. Attached as "Exhibit JJ" is a true and correct copy of an email I sent to Robinson on April 4, 2008, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH004348-4349.

61. Attached as "Exhibit KK" is a true and correct copy of an email I sent to Robinson on April 4, 2008, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH004353-4355.

62. Attached as "Exhibit LL" is a true and correct copy of an email I sent to Robinson on April 14, 2008, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH004363-4364.

63. Attached as "Exhibit MM" is a true and correct copy of an email I sent to Robinson on October 1, 2008, which I have been advised was produced during discovery and identified by Bates No. ZURICH004651.

64. Attached as "Exhibit NN" is a true and correct copy of an email I sent to Robinson on October 21, 2008, which I have been advised was produced during discovery and identified by Bates No. ZURICH004657.

65. Attached as "Exhibit OO" is a true and correct copy of an email I sent to Robinson on March 12, 2009, which I have been advised was produced during discovery and identified by Bates No. ZURICH004941.

66. Attached as "Exhibit PP" is a true and correct copy of an email I sent to Robinson on July 22, 2009, which I have been advised was produced during discovery and identified by Bates Nos. ZURICH002894.

Dated: New York, New York
October 7, 2011

_____
JENNIFER ROBBIE