# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

————————————

Nº 10-cv-3926 (JFB) (AKT)

————————————

HERMA ROBINSON,

Plaintiff,

VERSUS

ZURICH NORTH AMERICA INSURANCE COMPANY, and JENNIFER ROBBIE,

Defendants.

————————————

**MEMORANDUM AND ORDER**
September 21, 2012

————————————

JOSEPH F. BIANCO, District Judge:

Plaintiff Herma Robinson ("Robinson" or "plaintiff") commenced this action against Zurich North America Insurance Company ("Zurich") and Jennifer Robbie ("Robbie") alleging that Zurich and Robbie violated Robinson's constitutional rights, pursuant to 42 U.S.C. §§ 1981, 1983, and Robinson's rights under the New York State Human Rights Law ("NYSHRL") pursuant to N.Y. Exec. L. § 290 *et seq*. Robinson also alleges that Zurich violated her rights under Title VII of the Civil Rights Act of 1964 ("Title VII"), and the Age Discrimination in Employment Act ("ADEA"). Plaintiff is an African-American woman who was hired by Zurich in 2003 as a Quality Assurance Auditor in the Melville, New York office. Plaintiff alleges that she was the subject of (1) race and age discrimination, as well as retaliation, when she was terminated from employment in August 2009, and (2) a hostile work environment arising from, *inter alia*, an increased workload, heightened supervision, additional training, a decrease in bonus pay, placement on probation and eventual termination. Plaintiff seeks actual, compensatory and punitive damages, and attorneys' fees and other costs. Defendants contend, *inter alia*, that their adverse employment action against plaintiff was not based upon any discriminatory or retaliatory motive, but rather was based upon the plaintiff's poor job performance over an extended period of time, which ultimately ended in her termination from employment in August 2009. Defendants also contend that the hostile work environment claim has no merit.

Defendants now move for summary judgment on all claims, pursuant to Rule 56 of the Federal Rules of Civil Procedure.[1]

———————————

[1] Although there is a Section 1983 claim in the complaint, it is undisputed that the state action

For the reasons set forth below, the Court grants defendants' motion in its entirety with respect to the federal claims, and declines to exercise supplemental jurisdiction over the state law claims. Even construing the evidence in the record most favorably to plaintiff, including drawing all reasonable inferences in her favor, no rational jury could possibly find that the defendants' articulated reason for their adverse employment action against plaintiff – that is, her poor performance over an extended period with numerous attempts to allow her to correct it – was a pretext for discrimination. With respect to plaintiff's poor performance, the following facts are uncontroverted: (1) Joseph Kostkowski ("Kostkowski"), who supervised plaintiff from the time of her hire in 2003 until approximately August 2007 (and against whom plaintiff alleges no discriminatory intent), received complaints about plaintiff's communication style and had concerns about her performance, but decided to coach her before imposing any formal discipline; (2) Kostkowski and Robbie (who became plaintiff's supervisor in August 2007) jointly determined that plaintiff would benefit from taking an online communications course, and jointly rated plaintiff a "2" in her 2007 year-end performance evaluation, which is the equivalent of "partially meets expectations"; (3) plaintiff received a verbal warning in 2008 advising her that she needed to improve her accuracy and communication skills, which Kostkowski approved and agreed was necessary; (4) plaintiff received a written warning in May 2008, which noted that her re-audit accuracy score was 43% compliance, even though Zurich's goal was 93%, and also noted other deficiencies in her performance; (5) after plaintiff failed to improve, Robbie placed

plaintiff on a 45-day probation, the final warning in Zurich's corrective action process, beginning July 2, 2008; (6) plaintiff's year-end accuracy score for 2008 was 55.56%, her monthly score for February 2009 was 73.61%, and her accuracy rate for the first half of 2009 (prior to her termination) was still only 71.41%, well below the Company's expectation of 93%; (7) plaintiff received a "below expectations" rating for her 2008 year-end review; (8) after the verbal and written warning, as well as a probationary period, Zurich extended the probationary period, with Vice President Jenny Killgore ("Killgore") directing a 100% re-audit of her files; (9) in December 2008, Zurich discovered during the re-audit that plaintiff's accuracy rate was 45.22%; (10) in March 2009, Zurich's Claims Technical Training Department tested the Company's claims adjusters and auditors on their litigation management skills, and plaintiff received the second lowest score in the Company and was among only 5% of employees who failed the test; and (11) after plaintiff's poor performance continued after the verbal and written warnings, as well as the extended probationary period, Killgore and Robbie jointly decided to terminate plaintiff's employment.

Although plaintiff has no evidence to controvert the above-referenced evidence of poor performance, she does attempt to provide explanations for portions of the poor performance. For example, with respect to the second lowest score in the Company on the litigation management test, plaintiff asserts that she had just returned from leave and did not receive sufficient training. In short, plaintiff's efforts to explain certain aspects of her poor performance simply do not address the uncontroverted evidence and are insufficient to create a genuine issue of disputed fact to allow this claim to survive summary judgment. In any event, even though plaintiff disagrees with defendants'

---

requirement is not met. Thus, at oral argument, plaintiff agreed to dismissal of the Section 1983 claim.

assessment and even assuming *arguendo* that she had evidence to dispute their evidence regarding her poor performance, there is simply nothing in the record that would support a rational finding by a jury that her termination was a pretext for race, color, or age discrimination. In fact, the other evidence in the uncontroverted evidence record suggests the exact opposite. With respect to race and color, it is uncontroverted that Robbie, just as she did for plaintiff, gave warnings to two other Caucasian employees for their inadequate accuracy scores. Similarly, with respect to the age claims, it is undisputed that Zurich hired plaintiff when she was over the age of fifty and, at oral argument, plaintiff's counsel conceded he had no information regarding any similarly situated employee younger than plaintiff who was treated more favorably, or any other proof with respect to age. In short, there is simply no evidence from which a rational jury could find that the defendants' articulated reason for their adverse employment action as to plaintiff – namely, continuing poor performance after receiving a verbal and written warning, and being placed on probation – was a pretext for any type of discrimination. Moreover, even though plaintiff also makes a conclusory claim for a hostile work environment based upon these race-and-age-neutral actions by defendants, the record is completely devoid of any viable basis for a hostile work environment claim.

The retaliation claim also cannot survive a motion for summary judgment even construing the evidence most favorably to plaintiff. Even though plaintiff claims she complained to Robbie about discrimination in an October 2007 conversation, the first arguably adverse action did not occur until March 2008. This five-month lapse is simply too remote in time to support a causal connection for retaliation. Similarly,

the over one-year gap between her EEOC complaint in July 2008 and her termination in August 2009, is also insufficient to support an inference of retaliation. In any event, even assuming *arguendo* that plaintiff could establish temporal proximity, there is simply not a scintilla of evidence to demonstrate that the defendants' proffered reason of plaintiff's poor performance – supported by the above-referenced, uncontroverted evidence – was a pretext for retaliation.

In sum, none of the federal claims can survive summary judgment, and the Court declines to exercise supplemental jurisdiction over the state law claims.

## I. BACKGROUND

### A. Factual Background

The Court has taken the facts set forth below from the parties' depositions, affidavits, and exhibits, and from the parties' respective Rule 56.1 Statements of Facts. Upon consideration of a motion for summary judgment, the Court shall construe the facts in the light most favorable to the non-moving party. *See Capobianco v. City of New York*, 422 F.3d 47, 50 (2d Cir. 2005). Unless otherwise noted, where a party's 56.1 Statement is cited, that fact is undisputed or the opposing party has pointed to no evidence in the record to contradict it.[2]

### 1. Plaintiff's Role as a Closed File Auditor

In 2003, plaintiff interviewed for an auditor position with Zurich. (Defs.' 56.1 ¶ 5.) Kostkowski was among the individuals

---

[2] In addition, where the parties' Rule 56.1 Statements contain specific citations to the record to support their statements, the Court has cited to the Rule 56.1 Statements, rather than the underlying citation to the record, when utilizing the 56.1 Statements for purposes of this summary of facts.

who interviewed plaintiff for the position, and was the individual who made the decision to hire her. (*Id.*) At the time of her interview, plaintiff was over fifty years-old. (*Id.* ¶ 6.) On or about September 8, 2003, plaintiff began her employment at Zurich in its Melville, New York office as a quality assurance auditor. (*Id.* ¶ 7.) At the time of her hire, plaintiff reported to Kostkowski, who worked in Zurich's Baltimore, Maryland office. (*Id.*) As a quality assurance auditor, plaintiff was responsible for, among other things, reviewing closed files to measure the claim handlers' compliance with Zurich's "Best Practices," completing technical reports, providing claim management with feedback and recommendations for improving audits, making effective presentations to the field office staff, and working as a team member on group projects. (*Id.* ¶ 8.) The position also required plaintiff to travel thirty to thirty-five percent of her time. (*Id.*) Plaintiff never had an interest in being promoted beyond the auditor position. (*Id.* ¶ 9.)

From the start of plaintiff's employment to sometime between 2006 and 2007, plaintiff conducted closed file liability audits. (*Id.* ¶ 10.) Auditors reviewing closed files were responsible for reviewing all aspects of the claim handling process in a concluded case, from the creation of the file to its end. (*Id.*)

### 2. Plaintiff's Transition to Transactional Auditing

On or about April 2007, Kostkowski appointed plaintiff to the role of transactional auditor. (*Id.* ¶ 11.) Transaction audits focused on one specific aspect of an open file, rather than a review of the entire file from beginning to end. (*Id.*) After auditing the file, plaintiff scored the particular aspect of the file that she reviewed. (*Id.*) The claims adjuster then had an opportunity to submit a "rebuttal" if he or she believed that plaintiff's score was incorrect. (*Id.* ¶ 12.) On a transactional audit, a negative score can impact the whole file, and the scoring often created conflict and contention among the auditors and the audited claims adjusters and team managers. (Pl.'s 56.1 Statement of Additional Facts ¶ 41-42.) In addition to performing transactional audits, plaintiff's job duties included compiling the transactional audits completed by other employees into a master comprehensive report. (Defs.' 56.1 ¶ 16.)

According to Kostkowski's deposition testimony, plaintiff met with Patty Magid ("Magid"), a Zurich employee who performed transactional audits before plaintiff's reassignment, over "expectations and the audits." (Pl.'s Ex. 1, Kostkowski Deposition Transcript ("Kostkowski Dep.") at 115.) According to Magid, she did not think it was her job to give plaintiff support, but Magid provided plaintiff with "what [she] had in terms of spreadsheets and guidelines and things like that, audit results." (Pl.'s Ex. 4, Magid Deposition Transcript ("Magid Dep.") at 64-65.) According to plaintiff's deposition testimony, Magid "throw [sic] the documents to me" and told plaintiff how upset she was. (Pl.'s Ex. 2, Robinson Deposition Transcript ("Robinson Dep.") at 90.) On May 1, 2007, Magid forwarded plaintiff an audit guide.[3] (Pl.'s Ex. 11, Email Chain dated May 1, 2007.) According to Kostkowski's deposition testimony, he later learned that the audit guide had not been implemented yet, and there had been complaints regarding plaintiff's use of the guide. (Pl.'s Ex. 1, Kostkowski Dep. at 107-109.)

---

[3] According to the email chain, Magid requested the existing audit guidelines from Robbie, who sent guidelines back to Magid. Magid then forwarded what she had received from Robbie to plaintiff. (Pl.'s Ex. 11, Email Chain dated May 1, 2007.)

### 3. Robbie's Supervision of Plaintiff and Zurich's Concerns Regarding Plaintiff's Transactional Audits

Also in the spring of 2007, Zurich reorganized its auditing team and, as a result, Kostkowski was promoted to Vice President of Customer Services Auditing, a position two levels removed from the auditor level. (Defs.' 56.1 ¶ 17.) This reorganization created a supervisory position reporting to Kostkowski for the transactional audits line of business. (*Id.*) On August 1, 2007, Zurich hired Robbie for this supervisory position. (*Id.* ¶ 18.) Although Robbie was an outside hire at the time, she had previously worked for Zurich for several years prior to leaving briefly to work elsewhere. (*Id.*)

According to plaintiff's deposition testimony, on June 1, 2007, prior to Robbie's appointment as plaintiff's team manager, Robbie sent plaintiff her monthly audit without a salutation. (Pl.'s Ex. 2, Robinson Dep. at 87.) According to plaintiff, the other auditors normally say, "Hi, Herma," or "Hello, here it is," or some "acknowledgement of who [plaintiff is]." (*Id.* at 87-88.)

Though the parties dispute minor details regarding transactional audits as of 2007, it is undisputed that, in 2007, Zurich incorporated a subjective element into transactional audits. (Defs.' 56.1 ¶ 20; Pl.'s 56.1 Counter Statement ¶ 20.) According to Robbie's deposition testimony, in 2007, transactional auditors began looking at the "quality of an action" in addition to ensuring that claims adjusters were following the rules. (Walker Decl. Ex. D, Robbie Deposition Transcript ("Robbie Dep.") at 32-33.)

Plaintiff alleges that, in September 2007, Robbie assigned her 110 more audits than

any other employee as part of an "N3" audit. (Pl.'s 56.1 Statement of Additional Facts ¶ 58; Defs.' 56.1 ¶ 122.) According to Robbie's spreadsheet tracking audits, plaintiff had 431 audits in September 2007; the other auditors had 384, 325, 308, 228, and 360.[4] (Robbie Supp. Decl. Ex. A, Audit Spreadsheets.) According to Robbie's declaration, an auditor may have had more or less audits depending on additional non-audit assignments and depending on the complexity of the audits.[5] (Robbie Supp. Decl. ¶ 3.)

According to Kostkowski's deposition testimony, plaintiff sought perfect, as opposed to critical, information. (Walker Decl. Ex. E, Kostkowski Dep. at 143-44.[6]) According to Magid, claims adjusters complained that plaintiff's audits emphasized "form over substance." (Walker Decl. Ex. G, Magid Dep. at 33.) In an email sent to plaintiff on November 8, 2007, Robbie informed plaintiff, "I took a look at some of the N3 audits for last month. I think in some instances you [are] holding the files to a perfect information standard so let's

---

[4] In April 2007, plaintiff had 402 audits; the other auditors had 315, 537, 410, 447, and 264. (Robbie Supp. Decl. Ex. A, Audit Spreadsheets.) In August 2007, plaintiff had 218 audits; the other auditors had 227, 609, 199, 128, and 283. (*Id.*) In October 2007, plaintiff had 550 audits; the other auditors had 379, 480, 417, 401, 410, and 163. (Robbie Supp. Decl. Ex. A, Audit Spreadsheets.) In November 2007, plaintiff had 399 audits; the other auditors had 328, 518, 367, 355, 410, and 236. (*Id.*) In December 2007, plaintiff had 327 audits; the other auditors had 330, 569, 349, 413, 410, and 236. (*Id.*)

[5] According to an email dated April 9, 2008 from Robbie to plaintiff, Robbie "switched the more intensive Programs audits over to Pam [Burris] to handle and replaced them with standard claim office audits." (Robbie Decl. Ex. K, Email Dated April 9, 2008.) Robbie told plaintiff, "[t]his should provide you with some extra time." (*Id.*)

[6] Because the parties submitted only portions of the deposition transcripts, certain transcripts will be identified as both plaintiff's exhibit and defendants' exhibit.

discuss tomorrow." (Robbie Decl. Ex. D, Email dated November 8, 2007.)

By email dated November 19, 2007, Robbie provided plaintiff with comments regarding plaintiff's review of an adjuster's file and informed plaintiff that files should not be scored down because a file is missing non-critical information found elsewhere in the file. (Robbie Decl. Ex. F, Email Chain dated November 19, 2007.) Robbie also stated, "Please be careful that your comments are surrounding the critical information needed to evaluate the specific claim at hand and not generic." (*Id.*) According to an email Robbie sent herself on November 29, 2007, Robbie met with plaintiff and requested that she no longer identify certain information as "critical" in the audits. (Robbie Decl. Ex. T, Email dated November 29, 2007.)

In October 2008, plaintiff was informed by Pamela Burris, a Zurich employee in quality assurance, that plaintiff's "wanting to know if claimant was wearing a dress or pants or wearing glasses would be perfect vs[.] critical information." (Walker Decl. Ex. XX, Email dated October 21, 2008.)

### 4. Concerns Regarding Plaintiff's Communication Skills

According to Kostkowski, around 2005, Kostkowski became aware of a complaint from a manager who believed that plaintiff was "not professional" in her style of writing, and plaintiff did not want to discuss the case despite having discussed it many times before. (Walker Decl. Ex. E, Kostkowski Dep. at 51-52.) According to Kostkowski's deposition testimony, while he was plaintiff's supervisor, the audit team discussed "that the recommendation was made that [Robinson] needs to communicate more thoroughly in her responses in her audits to support the position that she was

taking, as well as through the discussion phase or the rebuttal phase, as we called it, when there was a face-to-face discussion with the field." (Pl.'s Ex. 1, Kostkowski Dep. at 60.)

According to Robbie's deposition testimony, around August 2007, she reached out to Kostkowski for guidance with respect to plaintiff. (Walker Decl. Ex. D, Robbie Dep. at 79-80.) Robbie had received information from the field offices that the relationship between plaintiff and the offices were "not going well and that [Kostkowski] had been involved in trying to resolve this issue and then it was transferred to [Robbie]." (*Id.* at 80.) According to Robbie, Kostkowski specifically mentioned that plaintiff was having problems with the Boston field office. (*Id.* at 90.) Around August 2007, four Zurich employees had contacted Robbie to voice complaints regarding interactions with the plaintiff. (*Id.* at 81-83.)

According to Robbie's deposition testimony, in late August 2007, Robbie and Kostkowski decided to have plaintiff take a communications class. (Walker Decl. Ex. D, Robbie Dep. at 93.) Plaintiff completed this one-day class. (Walker Decl. C, Robinson Dep. at 265.)

On September 10, 2007, Robbie sent plaintiff an email stating "[c]ommunication is crucial in the transactional audits. Your emails is [sic] so brief that the team manager does not understand what your intention [is]." (Robbie Decl. Ex. A, Email Chain dated September 10, 2007.) On September 11, 2007, Robbie emailed plaintiff stating, "I understand and I am glad that you have rectified the situation. I do not think the team managers understand your intent or how you are scoring a file when you provide the brief type of communication below. This is something that needs to improve. The

team manager should have clear understanding of how you have scored the file based on your communication going forward. . . . Clear communication is our responsibility." (Robbie Decl. Ex. B, Email Chain dated September 11, 2007.)

Between August 23 and September 18, 2007, Robbie attempted to set up a meeting to discuss communications issues with team managers and plaintiff, but the meeting did not take place. (Pl.'s Ex. 3, Robbie Dep. at 99-100.) According to Robbie's deposition testimony, Joe Solerno, one of the team managers, did not want to go forward with the meeting. (*Id.* at 100.) Despite that, Robbie continued to receive complaints from team managers about plaintiff's communications. (*Id.*)

On April 4, 2008, in response to an email chain between plaintiff and another Zurich employee, Robbie stated, "Herma: You need to be clearer in your explanations of findings and the reasons behind the findings to the claim offices." (Robbie Decl. Ex. GG, Email Chain dated April 4, 2008.)

According to Robbie's deposition testimony, Robbie moved plaintiff to audits that required less contact with the outside offices. (Walker Decl. Ex. D, Robbie Dep. at 87.)

### 5. Calibrations and Reviews of Plaintiff's Audits

Throughout plaintiff's tenure at Zurich, auditors commonly participated in calibration exercises. (Defs.' 56.1 ¶ 31.) Calibration exercises involve having multiple auditors review the same file and thereafter discuss their findings. (*Id.*) When Kostkowksi was plaintiff's direct supervisor, there was "some inconsistency" between plaintiff's scores for an audit and her peers' scores. (Walker Decl. Ex. E, Kostkowski

Dep. at 58-59.) To correct this problem, Kostkowski stated, "[W]e would calibrate some more. I would have a direct dialogue with [Robinson], or through an e-mail when I would review a file." (*Id.* at 59.) Kostkowski did not believe that this issue warranted a formal verbal or written warning, but it did warrant "a response, either verbally or through an e-mail, indicating these are some improvement opportunities that we need to really concentrate on and here is what we need to do to make sure that we reach that improvement." (*Id.* at 59-60.)

On September 21, 2007, Robbie sent plaintiff an email requesting that she "please slow down and make sure we are accurate." (Robbie Decl. Ex. P, Email Chain dated September 21, 2007.) In an email earlier in that same email chain, Robbie requested that plaintiff "please double check your work." (*Id.*)

According to plaintiff's deposition testimony, in October 2007, there was a calibration exercise. (Walker Decl. Ex. C, Robinson Dep. at 104.) Plaintiff, Robbie, Magid, Burris, and another auditor, John Morales, participated in a conference call regarding the exercise. (*Id.* at 104-05.) Robbie left the conference call early, and after Robbie's departure, Magid stated that "anybody [who] audit[s] like this should no longer be auditing inside Zurich." (*Id.*) According to Kostkowski's deposition testimony, Magid stated that plaintiff should be fired in a meeting with Kostkowski and two other Zurich employees, Deb Ligda and Charles Bono.[7] (Pl.'s Ex. 1, Kostkowski Dep. at 135.) Magid's comments bothered Kostkowski and he spoke with Magid. (*Id.*

---

[7] In an email from Kostkowski to himself on October 23, 2007, Kostkowski wrote that Magid stated "[t]hat we never should have hired [REDACTED] and Herma should be fired." (Pl.'s Ex. 17, Email dated October 23, 2007.)

at 137.) Kostkowski could not recall what he said to Magid, but stated at his deposition that he "would have said that statements such as that should have never been made in a group, and number two, there is no basis for that. It's something she should not say and she has no idea what anyone's performance is." (*Id.* at 137.)

On October 11, 2007, Robbie forwarded to Kostkowski an email that she had previously sent plaintiff. (Walker Decl. Ex. E, Kostkowski Dep. at 126-128; Walker Decl. Ex. V, Email Chain dated October 12, 2007.) In the email to Kostkowski, Robbie states, "Fyi. [Plaintiff] is really struggling from a skill perspective on all of these audits." (*Id.*) In an email to plaintiff earlier in the chain, Robbie explains certain aspects of the construction defects audits and states, "I think you need to consider a plan to increase your strength in this area." (*Id.*)

### 6. Plaintiff's Development Plan

In response to Robbie's email dated October 11, 2007 requesting that plaintiff consider a plan to increase her strength in a particular area, plaintiff responded to Robbie: "thank you very much. I am willing to be educated. Have a blessed weekend." (Walker Decl. Ex. Q, Email Chain dated October 12, 2007.) Robbie responded, "Herma, Please put together a plan together [sic] for yourself and we will discuss your ideas next week." (*Id.*) According to the deposition testimony of Catherine Spera ("Spera"), individual development plans have existed at Zurich for her entire tenure there, though there had been a push in recent years for all employees to do them. (Pl.'s Ex. 5, Spera Deposition Transcript ("Spera Dep.") at 60-61.)

According to Robbie's deposition testimony, during a phone call on October 23, 2007, plaintiff informed Robbie that it

was Robbie's job to create the plan for plaintiff. (Pl's. Ex. 3, Robbie Dep. at 110-11.) According to plaintiff's deposition testimony, in that same call, plaintiff informed Robbie that she felt she was being singled out because she was "the only black person reporting to" Robbie and "one of the oldest." (Pl.'s Ex. 2, Robinson Dep. at 117.) After this call, Robbie spoke with Spera, who documented the call and told Robbie to document all conversations with plaintiff and be clear in her expectations. (Walker Decl. Ex. W, Notes dated October 24, 2007.) According to Spera's deposition testimony, Spera asked Robbie if there "was anything she thought might be construed as discrimination." (Walker Decl. Ex. F, Spera Dep. at 134.) Robbie informed Spera that plaintiff did not talk about disparate treatment or discrimination.[8] (*Id.* at 134-35.) Spera stated that plaintiff's complaints "really were related to her performance review." (*Id.* at 136.) Spera did not contact plaintiff regarding her comments to Robbie. (*Id.* at 134-35.)

On October 29, 2007, Robbie emailed plaintiff with the development plan. (Walker Decl. Ex. S, Email dated October 29, 2012.) Among other things, the plan required plaintiff to send her completed audits to Robbie every Friday before the audits were finalized and released to the finance department. (*Id.*) Robbie also recommended that plaintiff take "AEI General Liability course number 217." (*Id.*) In Robbie's

---

[8] According to Spera's notes of the phone call with Robbie, "[plaintiff] also said [Robbie] is treating her differently from the rest of the staff. [Spera] asked [Robbie] if she was referring to anything that might be construed as discrimination. [Robbie] said that [plaintiff] said [plaintiff] felt it was because Joe Salerno had complaints about her. [Robbie] added that [plaintiff] is an African American woman over the age of 40. [Plaintiff] did not talk about disparate treatment or discrimination: but she only wants to communicate with [Robbie] by email." (Walker Decl. Ex. W, Spera Notes.)

deposition, she acknowledged that the completion of the AEI course may have increased plaintiff's workload. (Pl.'s Ex. 3, Robbie Dep. at 132.)

Robinson spoke with Kostkowski regarding the action plan. (Robbie Decl. Ex. S, Email dated October 29, 2007; Walker Decl. Ex. C, Robinson Dep. at 123-124.) Plaintiff did not tell Kostkowski that Robbie had singled her out because of her race or age. (Walker Decl. Ex. C, Robinson Dep. at 124.)

### 7. Plaintiff's Presentation in Omaha

On March 13 and 14, 2008, plaintiff traveled to Omaha, Nebraska to give a presentation to "Programs," a business unit within Zurich. (Defs.' 56.1 ¶ 43.) Burris attended the presentation in Robbie's absence. (*Id.* ¶ 44.) According to Robbie's deposition testimony, a team manager should be at the presentation to ensure that the presentation is consistent.[9] (Walker Decl. Ex. D, Robbie Dep. at 167.) Kostkowski participated in the presentation via conference call. (Defs.' 56.1 ¶ 44.) Robbie also wrote, in an email to Kostkowski on March 3, 2008 that forwarded complaints about plaintiff's audits, that "this is why [Robbie] need[s] someone to listen in on Herma's presentation."[10] (Walker Decl. Ex. AAA,

Email Chain dated March 3, 2008.) After the presentation, Morbach, Kostkowski, and Burris informed Robbie that the presentation was confusing and that "Pam [Burris] needed to jump in at certain times to help with bringing the conclusion in." (Walker Decl. Ex. D, Robbie Dep. at 173.) Martin Braun informed Robbie that plaintiff "did a very good job on her presentation . . . . [L]ater she met with some TM's – also positive feedback." (Pl.'s Ex. 24, Email dated March 24, 2008.)

### 8. Plaintiff's Performance Reviews

Zurich's 2005 Performance Management Current Review form rated employees on a scale of 0.0 (goal is not met) to 1.5 (goal is exceeded). (Walker Decl. Ex. U, Plaintiff's 2005 Review.) With respect to plaintiff's 2005 review, signed by Kostkowski, plaintiff received 1.0's (goal is fully met) for most of the listed tasks. (*Id.*) Plaintiff received two 1.1's. (*Id.*) The comments included remarks such as, "customer service is extremely important to [plaintiff]" and "[plaintiff] is a strong listener which helps her resolve many of the issues that surface during the discussion process." (*Id.*) The review also included comments that plaintiff "needs to seek more guidance with larger coverage issue claims" and "needs to be more demonstrative and clearer in her presentation of the issues and solutions." (*Id.*) Kostkowski testified at his deposition that no one under his supervision performed worse than plaintiff, and others were performing better. (Walker Decl. Ex. E, Kostkowski Dep. at 52-53.)

In 2007, Zurich instituted a more demanding performance management culture and no longer permitted employees to receive mediocre performance ratings.

---

[9] According to an email dated March 20, 2008, a Zurich employee named "Karen" had a "meeting with Pollution" without Robbie's supervision. (Pl.'s Ex. 22, Email dated March 20, 2008.)

[10] Earlier in the email chain, Robbie states that "a lot of the concerns are around the best practices application and those discussions should be held directly with Tom Lysaught. My team is only able to audit to standards set forth by Tom . . . ." (Walker Decl. Ex. AAA, Email Chain dated March 3, 2008.) Michelle Mobrach, the correspondent on the email with Robbie, then wrote that "there are many issues that [she was] hoping to resolve." (*Id.*) Later emails specified concerns regarding plaintiff's audit decisions. (*Id.*)

(Defs.' 56.1 ¶ 48.) According to Robbie's declaration, in 2007, "the company . . . implemented a more demanding performance management culture. Managers were advised that they needed to document performance deficiencies and utilize corrective action for underperforming employees, rather than tolerating mediocre performance ratings year after year." (Robbie Decl. ¶ 4.) The 2007 Year-End Assessment appears to have been scored on a scale of one through five. (Walker Decl. Ex. J, 2007 Year-End Assessment.) Plaintiff's overall assessment was a two, partially meets expectations.[11] (Id.) Robbie and Kostkowski agreed on this score. (Id.; Walker Decl. Ex. E. Kostkowski Dep. at 118.) Plaintiff received mixed comments in the review. (Walker Decl. Ex. J, 2007 Year-End Assessment.)

Around the same time as plaintiff's 2007 year-end performance evaluation, Robbie and Kostkowski agreed to issue plaintiff a verbal warning advising her that she needed to improve her accuracy and her communication skills. (Defs.' 56.1 ¶ 50.) The final draft of the warning noted that plaintiff's re-audit accuracy for January and February was calculated at 50% compliance, which was below the company's 93% expectation, and her communications were unclear. (Id. ¶ 51.) The warning required that plaintiff improve her accuracy scores and her style of communicating within the next thirty days. (Id.)

On March 19, 2008, Robbie asked plaintiff to meet her in the Rocky Hill,

Connecticut office to discuss plaintiff's performance review. (Id. ¶ 52.) After learning that she would be traveling to Rocky Hill to meet with Robbie, plaintiff called Spera and informed Spera that she was "not treated properly." (Id. ¶ 53.) Plaintiff stated that she was not being treated equally to her peers. (Walker Decl. Ex. Y, Spera Notes.) Plaintiff expressed her dissatisfaction with having to take a communications course. (Id.)

Robbie met with plaintiff on March 25, 2008, in Rocky Hill. (Defs.' 56.1 ¶ 56.) During the meeting, Robbie issued the verbal warning and the 2007 year-end evaluation, and then provided plaintiff with an opportunity to discuss the documents. (Id.) Plaintiff stated that she did not have any questions or comments, and the meeting ended quickly. (Id.) Plaintiff refused to sign the verbal warning. (Id. ¶ 57.) Plaintiff refused to sign the review. (Walker Decl. Ex. J, 2007 Year-End Assessment.) Plaintiff did not discuss her 2007 performance evaluation with Kostkowski, who had signed off on the evaluation. (Defs.' 56.1 ¶ 57.)

On March 25 and 27, 2008, plaintiff contacted Spera regarding the meeting and her review. (Defs.' 56.1 ¶ 60-61; Walker Decl. Ex. Y, Spera Notes.) Plaintiff informed Spera that she was retaining an attorney. (Defs.' 56.1 ¶ 62.) Spera offered to come to plaintiff's office in Melville to speak to plaintiff in person. (Id.) Plaintiff informed Spera that she would review her performance evaluation and get back to Spera. (Id.)

According to plaintiff's declaration, on March 27, 2008, Robbie revisited the March 2008 assignments and assigned plaintiff 587 files to audit; another auditor, Deb Conley received 535 files and Burris received 249. (Robinson Decl. ¶ 22.) According to Robbie's audit spreadsheets, plaintiff had

---

[11] On November 29, 2007, Robbie sent plaintiff an email indicating that the rating at that time was a placeholder, and that her "pmp" would be completed at the end of the year. (Pl's Ex. 25, Email dated November 29, 2007.) Plaintiff's notes with respect to that email indicate that she received a two rating at that time. (Id.) The two rating remained the score on the review.

494 files to audit in March 2008; the other auditors had 525, 496, 336, 613, 100, and 496. (Robbie Supp. Decl. Ex. A, Audit Spreadsheets.) In April 2008, plaintiff had 667 files to audit; the other auditors had 525, 646, 407, 469, 1369, and 596. (*Id.*)

Plaintiff began forwarding emails to Spera expressing her dissatisfaction with Robbie and questioning decisions made with respect to other auditors and Zurich employees. (Walker Decl. Exs. AA, BB, CC, FF, GG, II, & OO, Emails from Robinson to Spera.)

In April 2008, plaintiff received her 2007 bonus which was approximately thirteen thousand dollars less than what she had received the previous year. (Pl.'s 56.1 Statement of Additional Facts ¶ 102.) As noted *supra*, on April 9, 2008, Robbie informed plaintiff that she was shifting the more intensive Programs audits to Burris to provide plaintiff with extra time. (Robbie Decl. Ex. K, Email dated April 9, 2008.)

### 9. Plaintiff's Written Warning

On May 8, 2008, plaintiff was issued a written warning for her performance. (Defs.' 56.1 ¶ 68; Walker Decl. Ex. Z, Written Warning.) The warning indicated that plaintiff's year-to-date re-audit accuracy was calculated at 43% compliance against a goal of 93% compliance. (*Id.*) The warning also indicated that plaintiff requested an extension of time to complete her quarterly reports on the date they were due, and the quarterly reports "did not demonstrate subject matter expertise or professional and effective written communications." (*Id.*) Plaintiff was advised that her performance would be monitored for the next thirty days to determine improvement, and that a failure to meet the performance standards outlined in the warning may result in termination. (*Id.*)

### 10. Plaintiff's Probation

On July 2, 2008, Spera, Robbie and plaintiff met to discuss plaintiff's performance. (Defs.' 56.1 ¶ 71.) Robbie participated via telephone. (*Id.*) Robbie informed plaintiff that she was still not performing proficiently and consequently was being placed on probation. (*Id.*) Plaintiff did not say anything in response and did not, at any point during the meeting, mention her race, color or age, or claim that she was placed on probation as a result of race, color, or age. (*Id.*) After Robbie disconnected from the call, Spera informed plaintiff that she was going to mail plaintiff a Separation Agreement for her review. (*Id.* ¶ 72.) According to Spera's deposition testimony, under Zurich's corrective action policy at the time, when an employee was placed on probation, the employee was offered a separation option. (Walker Decl. Ex. F, Spera Dep. at 188.)

Plaintiff was placed on probation for forty-five days; this was the final step in Zurich's corrective action process. (Defs.' 56.1 ¶ 70.) The written warning indicated that plaintiff's year-to-date re-audit accuracy was calculated at 47.6% compliance against a goal of 93%. (Walker Decl. Ex. L, Probation Final Warning.)

From July 2, 2008 through October 1, 2008, while plaintiff was on probation, plaintiff took a medical leave of absence. (Defs.' 56.1 ¶ 74.) On July 17, 2008, plaintiff filed a complaint of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging that Zurich was discriminating against plaintiff on the basis of her race, color, age, and national origin. (*Id.* ¶ 75.)

On October 1, 2008, when plaintiff returned from leave, Zurich extended plaintiff's probationary period for another

forty-five days; according to Spera's deposition testimony, this was so that plaintiff "wouldn't lose time because of being out." (*Id.* ¶ 76; Walker Decl. Ex. F, Spera Dep. at 202.) Robbie arranged for plaintiff to engage in practice calibration exercises that would not be scored. (Defs.' 56.1 ¶ 76.)

When plaintiff returned from leave, she was asked to complete a year-end report compiling information from plaintiff's audits and the other auditors' files. (*Id.* ¶ 77.) Killgore, a vice president in quality assurance and training, offered to have Jackie Grebitus, another auditor within the group, Burris or Robbie assist plaintiff with completing the report. (Defs.' 56.1 ¶ 77; Walker Decl. Ex. O, Email Chain dated January 13, 2009.) Although plaintiff acknowledged in her deposition that she had the skills to write the report, and that she had written this kind of report previously, she felt that she needed training to complete the report because she was told that "writing the report has changed." (Walker Decl. Ex. C, Robinson Dep. at 202-03.) Plaintiff ultimately did not create her year-end report. (Defs.' 56.1 ¶ 79.)

On December 9, 2008, Robbie informed plaintiff that her monthly accuracy scores were 42% for October and 57% for November, below the 93% expected accuracy. (Defs.' 56.1 ¶ 80.) Plaintiff's probationary status was extended. (*Id.* ¶ 80.) According to Robbie's deposition testimony, there were discussions regarding plaintiff's termination at the end of 2008, but the decision-makers felt it was inappropriate to terminate plaintiff around the holidays, and that there were ongoing legal negotiations. (Pl.'s Ex. 3, Robbie Dep. at 191-92.) Plaintiff's year end accuracy score for 2008 was 55.56%, and her monthly accuracy score for February 2009 was 73.61%. (Defs.' 56.1 ¶ 81.)

In December 2008, Killgore decided to conduct a "100% reaudit" of plaintiff's work, which entailed having other team members re-audit all of plaintiff's audits. (Defs.' 56.1 ¶ 88.) Plaintiff was informed of the re-audit on December 9, 2008. (*Id.*) When plaintiff discovered that she and Grebitus had been assigned the same file, she complained to Killgore and Spera that it was "strange" that this occurred after she brought a complaint against the Company. (*Id.* ¶¶ 89-90.) Killgore responded that the review and re-audit process had nothing to do with a complaint against the Company. (Walker Decl. Ex. O, Email Dated January 13, 2012.)

On December 31, 2008, during the re-audit, Burris informed Robbie that plaintiff was then at a 45.22% accuracy rate. (Defs.' 56.1 ¶ 91.)

Plaintiff received a "below expectations" rating for her 2008 year-end review. (*Id.* ¶ 85.) The review noted that plaintiff's work results yielded a 59% year-to-date accuracy and that plaintiff had difficulty with the creation of quarterly reports. (*Id.*) The review noted that plaintiff's reports contained illegible graphs and did not demonstrate a strong grasp of the subject matter. (*Id.*) On March 19, 2009, plaintiff met with Robbie via telephone to discuss her 2008 performance evaluation. (*Id.* ¶ 87.) During this call, plaintiff did not make any comments regarding her race, age or color. (*Id.*)

11. Litigation Examination

On March 11, 2009, Zurich's Claims Technical Training department tested the Company's claims adjusters and auditors on their litigation management skills. (*Id.* ¶ 83.) Plaintiff failed the exam and received the

second lowest score in the company.[12] (*Id.* ¶ 84.)

### 12. Facts Surrounding Plaintiff's Vacation Time

In plaintiff's complaint, plaintiff alleges that defendants "denied her vacation" in 2009. (*Id.* ¶ 94.) However, plaintiff concedes she was able to take her vacation, but contends she had to "fight" for it. (Pl.'s 56.1 Counter Statement ¶ 94.)

On August 23, 2007, plaintiff informed Robbie that she would be on vacation from August 27 through August 31, 2007. (Defs.' 56.1 ¶ 95.) Robbie asked whether plaintiff had cleared the vacation with Kostkowski previously, as Robbie was only given two days' notice. (*Id.*) Plaintiff responded that "[d]uring the Month of August, I would go away on a Missionary trip which has been my commitment." (Robbie Decl. Ex. O, Email Chain dated August 23, 2007.) Plaintiff stated that, in the future, she would provide Robbie with advance notice. (*Id.*)

On June 3, 2009, Robbie received notification that plaintiff would be on vacation from August 12 through August 25, 2009. (Walker Decl. Ex. UU, Email Chain dated June 8, 2009.) Robbie asked plaintiff if she had submitted the August vacation dates for approval and stated that a lot of people had already scheduled vacation days

in August. (*Id.*) Plaintiff responded "Yes! My missionary trip is booked. Zurich is aware that I am a missionary when I was hired." (*Id.*) Robbie then again asked whether plaintiff had submitted the vacation request for approval and noted that Robbie's calendar reflected that plaintiff "just put the days in last week." (*Id.*) Plaintiff responded that she posted the time off to Robbie's calendar and the "GEMS" and asked if there was a procedure she was missing. (*Id.*) Robbie responded by including the policy for Paid Time Off ("PTO") which stated that PTO had to be approved by an immediate supervisor. (*Id.*) Plaintiff responded that her vacation was "planned and set in stone. There are no other N3 Liability Auditor [sic] out during my time." (*Id.*) Robbie then responded that auditors back different lines of business, and that when three other auditors are out on approved PTO, other auditors would back the vacationing auditors regardless of the line of business. (*Id.*) In response, plaintiff forwarded the emails and wrote to Chris Theros, Zurich's Group Head of Human Resources, detailing her work as a missionary and stating, "I have posted PTO on August 12, 2009 to August 25, 2009 as I will be leaving for an International Missionary trip. You should note that various media organizations cover these events." (*Id.*)

On June 9, 2009, Killgore responded to plaintiff's email, stating, "[p]lease note that the procedure that Jennifer requested you follow is appropriate and is outlined for you in the email based on the HR guidelines currently published." (*Id.*) Killgore stated that she had confirmed with Robbie that individuals on another team could handle plaintiff's work, and because of that, plaintiff's PTO was approved. (*Id.*) Killgore noted that PTO must be approved in advance by plaintiff's immediate supervisor. (*Id.*)

---

[12] According to emails between plaintiff and Robbie, while plaintiff was on vacation in 2007, there had been a litigation management calibration exercise, which plaintiff did not have to make-up because it was not an audit that she completed on a regular basis. (Pl.'s Ex. 51, Email Chain Dated December 10, 2007.) Although plaintiff states that she was not given training in advance of test, there is no evidence that the calibration exercise had anything to do with the test. In fact, the above-referenced exhibit cited by plaintiff on this issue appears to be a specific transactional audit calibration with no apparent relationship to the exam.

### 13. Plaintiff's Termination

On August 31, 2009, Spera and Robbie met with plaintiff in a conference room in the Melville, New York office and informed plaintiff that her employment was terminated. (Defs.' 56.1 ¶ 93.)

### B.  Procedural Background

Plaintiff filed the complaint in this action on August 26, 2010.  Defendants answered the complaint on September 21, 2010.  On October 7, 2011, defendants moved for summary judgment.  Plaintiff submitted her opposition on November 21, 2011.  Defendants submitted their reply on December 9, 2011.  The Court held oral argument on February 17, 2012.  At the oral argument, the Court requested additional information from defendants, which was provided on March 8, 2012.  The Court has fully considered the submissions of the parties.

### II. STANDARD OF REVIEW

The standards for summary judgment are well settled.  Pursuant to Federal Rule of Civil Procedure 56(a), a court may only grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of showing that he or she is entitled to summary judgment. *Huminski v. Corsones*, 396 F.3d 53, 69 (2d Cir. 2005).  "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1).  The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 122 (2d Cir. 2004) (quoting *Weyant v. Okst*, 101 F.3d 845, 854 (2d Cir. 1996)); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986) (summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

Once the moving party has met its burden, the opposing party "'must do more than simply show that there is some metaphysical doubt as to the material facts . . . . [T]he nonmoving party must come forward with specific facts showing that there is a *genuine issue for trial.*'" *Caldarola v. Calabrese*, 298 F.3d 156, 160 (2d Cir. 2002) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986) (emphasis in original)).  As the Supreme Court stated in *Anderson*, "[i]f the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. 2505 (citations omitted).  Indeed, "the mere existence of *some* alleged factual dispute between the parties" alone will not defeat a properly supported motion for summary judgment. *Id.* at 247-48, 106 S. Ct. 2505 (emphasis in original).  Thus, the nonmoving party may not rest upon mere conclusory allegations or denials but must set forth "'concrete particulars'" showing that a trial is needed. *R.G. Group, Inc. v.*

*Horn & Hardart Co.*, 751 F.2d 69, 77 (2d Cir.1984) (quoting *SEC v. Research Automation Corp.*, 585 F.2d 31, 33 (2d Cir. 1978)). Accordingly, it is insufficient for a party opposing summary judgment "'merely to assert a conclusion without supplying supporting arguments or facts.'" *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996) (quoting *Research Automation Corp.*, 585 F.2d at 33).

The Second Circuit has provided additional guidance regarding summary judgment motions in discrimination cases:

> We have sometimes noted that an extra measure of caution is merited in affirming summary judgment in a discrimination action because direct evidence of discriminatory intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions. *See, e.g., Gallo v. Prudential Residential Servs.*, 22 F.3d 1219, 1224 (2d Cir. 1994). Nonetheless, "summary judgment remains available for the dismissal of discrimination claims in cases lacking genuine issues of material fact." *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997); *see also Abdu-Brisson v. Delta Air Lines, Inc.*, 239 F.3d 456, 466 (2d Cir. 2001) ("It is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.").

*Schiano v. Quality Payroll Sys.*, 445 F.3d 597, 603 (2d Cir. 2006) (quoting *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 69 (2d Cir. 2001)).

## III. DISCUSSION

Defendants moved for summary judgment on the following grounds:[13] (1) plaintiff cannot establish a *prima facie* case of race, color, or gender discrimination, and in any event, defendants had a legitimate, non-discriminatory reason for its actions which plaintiff cannot establish was pretextual; (2) plaintiff does not have sufficient evidence to establish a hostile work environment claim; and (3) plaintiff cannot establish a *prima facie* case of retaliation.[14]

---

[13] Defendants also argued that summary judgment should be granted on plaintiff's claim pursuant to 42 U.S.C. § 1983 ("Section 1983") because defendants were not acting under color of state law. Plaintiff did not respond to that portion of the brief and, at oral argument, plaintiff's counsel consented to dismissal of that claim.

[14] In their reply papers, defendants argue that plaintiff's opposition and 56.1 Statement do not comply with Local Rule 56.1. (Defs.' Reply at 4-6.) In particular, the defendants argue that plaintiff's 56.1 Statement in Opposition lacks citations to evidence, mischaracterizes the record, or contains arguments. The Court agrees that plaintiff's Rule 56.1 Statement is deficient, in many instances, for the reasons articulated by the defendants. However, "[a] district court has broad discretion to determine whether to overlook a party's failure to comply with local court rules." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001); *see also Gilani v. GNOC Corp.*, No. 04 Civ. 2935(ILG), 2006 WL 1120602 at *2 (E.D.N.Y. Apr. 25, 2006) (exercising court's discretion to overlook the parties' failure to submit statements pursuant to Local Civil Rule 56.1). In their reply, defendants were able to respond fully to plaintiff's arguments regarding the factual record notwithstanding these defects in the Rule 56.1 Statement. Moreover, the Court has fully examined all of the cited evidence in the 56.1 statements to ensure there is admissible evidence in the record to support each and every contention. Thus, the Court is only considering facts supported by the record, and defendants have not been prejudiced by any inaccurate or unsupported assertions in the plaintiff's Rule 56.1 statement. As discussed *infra*, after fully considering all of plaintiff's submissions and carefully examining the record, there is insufficient

For the reasons set forth below, the Court grants summary judgment with respect to (1) plaintiff's Title VII and 42 U.S.C. § 1981 ("Section 1981") race discrimination claims, (2) plaintiff's ADEA claims, and (3) plaintiff's Title VII and ADEA retaliation claims because, even assuming plaintiff has established a *prima facie* case on these claims, defendants have articulated legitimate, non-discriminatory reasons for the termination, and plaintiff has submitted insufficient evidence from which a rational jury could find pretext.[15] The Court also grants summary judgment with respect to plaintiff's Title VII and 42 U.S.C. § 1981 hostile work environment claims based on race, as well as plaintiff's ADEA hostile work environment claim based on age, because plaintiff has failed to proffer any evidence from which a rational jury could conclude that a hostile work environment, based on race or age, existed.

A. Plaintiff's Employment Discrimination Claims.[16]

1. Legal Standard

The "ultimate issue" in any employment discrimination case is whether the plaintiff has met her burden of proving that the adverse employment decision was motivated at least in part by an "impermissible reason," i.e., that there was discriminatory intent. *Fields v. N.Y. State Office of Mental Retardation & Dev'l Disabilities*, 115 F.3d 116, 119 (2d Cir. 1997); *see Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 146 (2000). In the absence of direct evidence of discrimination, claims for employment discrimination based on race and/or age brought pursuant to Section 1981 or pursuant to Title VII and the ADEA, are analyzed under the three-step, burden-shifting framework established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). *See Mavrommatis v. Carey Limousine Westchester, Inc.*, No. 10-3404-cv, 2011 WL 3903429, at *2 (2d Cir. Sept. 7, 2011) (Section 1981, Title VII and ADEA claims); *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (Title VII discrimination claim based on race, color, and national origin).

---

factual basis (even construed most favorably to plaintiff) for any of the federal claims to survive a motion for summary judgment.

[15] As discussed below, plaintiff cannot establish a *prima facie* case of retaliation under Title VII or the ADEA.

[16] The plaintiff's opposition brief states that "Plaintiff's counsel previously included an additional cause of action under 42 U.S.C. § 1981 et seq. on the Complaint in error, and agrees to discontinue this claim." (Pl.'s Opp. at 1 n.1.) However, elsewhere in the opposition, plaintiff refers to a claim for race discrimination under "1981." (*Id.* at 6 n.2.) It appears that plaintiff was attempting to discontinue the Section 1983 claim, but not the Section 1981 claim. Thus, the Court assumes that plaintiff wishes to continue her claim pursuant to 42 U.S.C. § 1981, which is analyzed under the same legal framework as the Title VII race discrimination claim. As stated *infra*, defendants' motion for summary judgment with respect to all claims, including the 42 U.S.C. § 1981 claim, is granted.

First, a plaintiff must establish a *prima facie* case of unlawful discrimination by showing that (1) he is a member of a protected class (2) who performed his job satisfactorily (3) but suffered an adverse employment action (4) under circumstances giving rise to an inference of discrimination (or retaliation).[17] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 802 n.13 (1973) (noting that elements of prima facie case vary depending on factual circumstances); *Stratton v. Dep't for the Aging for the City of New York*, 132 F.3d 869, 879 (2d Cir. 1997).

Second, if the plaintiff establishes a *prima facie* case, "a rebuttable presumption of discrimination arises and the burden then shifts to the defendant to articulate a legitimate, nondiscriminatory reason for the employment decision." *Stratton*, 132 F.3d at 879; *see Reeves*, 530 U.S. at 142-43. The purpose of this step is "to force the defendant to give an explanation for its conduct, in order to prevent employers from simply remaining silent while the plaintiff founders on the difficulty of proving discriminatory intent." *Fisher v. Vassar College*, 114 F.3d 1332, 1335-36 (2d Cir. 1997) (en banc), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000).

Third, if the employer articulates a nondiscriminatory reason for its actions, the presumption of discrimination is rebutted and it "simply drops out of the picture." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993) (citation omitted); *see also James v. N.Y. Racing Ass'n*, 233 F.3d 149, 154 (2d Cir. 2000). The burden then shifts back to the plaintiff to show, without the benefit of any presumptions, that more likely than not the employer's decision was motivated, at least in part, by a discriminatory reason. *See Fields*, 115 F.3d at 120-21; *Connell v. Consol. Edison Co.*, 109 F. Supp. 2d 202, 207 (S.D.N.Y. 2000).

To meet this burden, the plaintiff may rely on evidence presented to establish his *prima facie* case as well as additional evidence. Such additional evidence may include direct or circumstantial evidence of discrimination. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-101 (2003). It is not sufficient, however, for a plaintiff merely to show that he satisfies "*McDonnell Douglas*'s minimal requirements of a prima facie case" and to put forward "evidence from which a factfinder could find that the employer's explanation . . . was false." *James*, 233 F.3d at 157. Instead, the key is whether there is sufficient evidence in the record from which a reasonable trier of fact could find in favor of plaintiff on the ultimate issue, that is, whether the record contains sufficient evidence to support an inference of discrimination. *See id.*; *Connell*, 109 F. Supp. 2d at 207-08.

As the Second Circuit observed in *James*, "the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove – particularly discrimination." 233 F.3d at 157; *see also Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir. 1998) ("The thick accretion of cases interpreting this burden-shifting framework should not obscure the simple principle that lies at the core of anti-

---

[17] As the Second Circuit has explained, "pursuant to the Supreme Court's recent decision in *Gross v. FBL Financial Services, Inc.*, --- U.S. ----, 129 S.Ct. 2343, 2350-51, 174 L.Ed.2d 119 (2009), a claimant bringing suit under the ADEA must demonstrate that age was not just a motivating factor behind the adverse action, but rather the 'but-for' cause of it. *See id.* Title VII, on the other hand, does authorize a 'mixed motive' discrimination claim." *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 498 (2d Cir. 2009) (citation omitted).

discrimination cases. In these, as in most other cases, the plaintiff has the ultimate burden of persuasion.").

### 2. Application[18]

Defendants argue that plaintiff cannot establish a *prima facie* case of race and discrimination in connection with the termination because her poor performance rendered her unqualified for the position and that plaintiff was not terminated under circumstances giving rise to an inference of discrimination.[19] (Defs.' Mem. of Law at 9-14.) For the purpose of this motion, the Court assumes that plaintiff has satisfied the minimal burden required by *McDonnell Douglas* to make out a *prima facie* case of race and age discrimination.

Defendants have put forth a legitimate, non-discriminatory reason for plaintiff's

discipline and termination – namely, that plaintiff performed poorly in her position. Defendants state that plaintiff "failed to understand concepts behind her audits, often made mistakes, failed to grasp the skills necessary for her position, had unacceptably low accuracy scores, and asked Robbie and her co-workers basic questions that an auditor at her experience level should have known. . . . Additionally, [p]laintiff consistently communicated in an abrupt, rude, and unclear fashion, prompting numerous complaints by other employees regarding their frustration at having to decipher [p]laintiff's cryptic statements." (*Id.* at 15 (citations omitted).)

Hence, the Court proceeds directly to the ultimate question of whether plaintiff has presented sufficient evidence from which a reasonable jury could find race or age discrimination by examining each party's evidence individually and then proceeding to evaluate the evidence as a whole. *See Tomney v. Int'l Ctr. for the Disabled*, 357 F. Supp. 2d 721, 742 (S.D.N.Y. 2005); *Stern v. Trs. of Columbia Univ.*, 131 F.3d 305, 314 (2d Cir. 1997); *see also Siano v. Haber*, 40 F. Supp. 2d 516, 519-20 (S.D.N.Y. 1999), *aff'd mem.*, 201 F.3d 432 (2d Cir. 1999).

For the reasons set forth below, the Court finds that plaintiff has proffered no evidence from which a reasonable jury could conclude that discriminatory animus based on race or age motivated defendants' decision to discipline and terminate plaintiff.

In support of her race and age discrimination claims, plaintiff argues that (1) plaintiff did not receive proper training on transactional audits and a learning curve existed for these audits, (2) Zurich's "best practices" model included a subjective element, and (3) plaintiff received some positive performance feedback, an increased workload and trained another employee,

---

[18] It is clear from the complaint, as well as plaintiff's opposition papers, that the discrimination claims are based upon the termination, and not any other alleged adverse employment actions. In fact, the heading of "Point II" of plaintiff's opposition brief confirms that fact. (Pl.'s Opp. at 6.) In any event, discrimination claims regarding any other allegedly adverse employment actions would fail for the same reasons, discussed *infra*, that apply with respect to the termination claim.

[19] Defendants also argue that plaintiff misrepresented certain facts, which demonstrates the weakness of her arguments. (Defs.' Reply at 1-3.) The Court agrees that plaintiff's opposition papers contain a number of factual inaccuracies. For example, plaintiff contends that "Robbie was made aware of mistakes that John Morales, a younger, White coworker [made]" but did not discipline Morales. (Pl.'s Opp. at 10.) However, defendants noted in their reply (and plaintiff conceded at oral argument) that Morales is a non-White employee. In addition, plaintiff claimed that she was the "oldest [employee] on her team" reporting to Robbie, but defendants submitted uncontroverted evidence that there was an employee older than plaintiff on Robbie's team. However, as noted *supra*, the Court has carefully checked the record to ensure that any statements in the 56.1 statements are supported by admissible evidence.

Karen Prudent, which indicates that plaintiff was a trusted employee.

Defendants, however, have set forth, *inter alia*, the following uncontroverted evidence: (1) when plaintiff was hired in 2003, she was over fifty years-old; (2) Kostkowski received complaints about plaintiff's communication style when he was her supervisor; (3) while plaintiff was under Kostkowski's supervision, though no other employees were performing worse than plaintiff, others were performing better; (4) after complaints, Kostkowski and Robbie determined that plaintiff should take a communications course; (5) Kostkowski and Robbie jointly rated plaintiff a two, or "partially meets expectations" in her 2007 performance review; (6) Robbie delivered, and Kostkowski approved, a verbal warning to plaintiff in 2008 regarding her accuracy and communication skills; (7) plaintiff received a written warning in May 2008 advising her that she needed to improve her accuracy and the quality of her quarterly reports; (8) plaintiff's accuracy scores in 2008 and 2009 fell below Zurich's goal of 93%; and (9) plaintiff received the second lowest score on the litigation management test.

None of plaintiff's arguments or purported factual disputes regarding the quality of plaintiff's work are sufficient to allow a rational jury to find that the legitimate, non-discriminatory reason for terminating plaintiff was a pretext for discrimination. With respect to plaintiff's first argument, it is unclear from the record whether other Zurich employees were offered training while plaintiff was not. Kostkowski believed that plaintiff had received training on transactional audits, and there is nothing in the record to suggest that Robbie was aware that plaintiff was working off of a guide that had yet to be

implemented.[20] In fact, this guide had been delivered to plaintiff in May 2007, when Kostkowski was still plaintiff's supervisor. Plaintiff admitted at her deposition that she does not have any facts which would cause her to believe that anyone at Zurich discriminated against her prior to June 1, 2007. (Defs.' 56.1 ¶ 101.)

With respect to plaintiff's second argument, although the parties agree that there is a subjective element to auditing, there is nothing to suggest that because there is this subjective element, the defendants' dissatisfaction with plaintiff's work was pretextual. The question in this Title VII case is not whether defendants' decision to terminate plaintiff was correct but whether it was discriminatory. It is well settled that the mere fact that an employee disagrees with an employer's evaluation of that employee's misconduct or deficient performance, or even has evidence that the decision was

---

[20] Plaintiff argues in her opposition that "Robbie was aware that she and Magid provided Robinson with the incorrect manual, and yet did nothing to correct that error, encouraging negative evaluations of Robinson's audits and establishing a pretext for her eventual termination Specifically, Robinson's 2007 performance evaluation was negatively impacted by these actions." (Pl.'s Opp. at 15.) Plaintiff's evidence for this argument, both in her opposition and her 56.1 Statement of Additional Facts, is plaintiff's 2007 performance evaluation. (*Id.*; Pl.'s 56.1 Statement of Additional Facts ¶ 27.) In fact, the statements regarding retroactive application of a new manual in plaintiff's 2007 performance review were from Kostkowski, and Robbie noted that "[t]his goals [sic] refers to the period of time before I was managing Herma. All assignments have been completed timely by Herma since [] August-Dec." (Pl.'s Ex. 9.) Defendants note that, in any event, "Plaintiff was not terminated in 2009 because of this incident in 2007; the termination stemmed from Plaintiff's overall poor auditing skills, her failure to understand the basic concepts of her position, and the complaints made by the field claims employees regarding her blunt communications, all of which began well before 2007 and continued until Plaintiff's termination in 2009." (Def.'s Reply, at 1-2.)

objectively incorrect, does not necessarily demonstrate, by itself, that the employer's proffered reasons are a pretext for termination. *See, e.g., McPherson v. N.Y.C. Dep't of Educ.*, 457 F.3d 211, 216 (2d Cir. 2006) ("In a discrimination case . . . we are decidedly not interested in the truth of the allegations against plaintiff. We are interested in what motivated the employer." (quotations and citations omitted)); *McLee v. Chrysler Corp.*, 109 F.3d 130, 135 (2d Cir. 1997) (finding summary judgment appropriate on Section 1981 and Title VII discriminatory discharge claims where plaintiff's "disputations [of his employer's proffered explanations] were rationalizations for his deficiencies rather than demonstrations of any genuine issue of material fact to be tried"); *Rorie v. United Parcel Serv., Inc.*, 151 F.3d 757, 761 (8th Cir. 1998) (stating that "the relevant inquiry was whether [plaintiff] created a genuine issue of material fact as to whether her discharge was gender-based and not whether her termination was reasonable" and noting that "[i]t is not the task of this court to determine whether [the investigator's] investigation was sufficiently thorough or fair"); *Miller v. Nat'l Assoc. of Sec. Dealers, Inc.*, 703 F. Supp. 2d 230, 247 (E.D.N.Y. 2010) ("The relevant inquiry is not whether the performance-based justification for plaintiff's termination articulated by defendant is accurate or fair, but whether plaintiff can show any evidence that it was not the actual justification" and plaintiff "cannot accomplish this by stating his disagreement with his supervisors' negative assessment of his performance, even [if he] has evidence that the decision was objectively incorrect.'" (citations and quotations omitted)); *Brown v. Soc'y for Seaman's Children*, 194 F. Supp. 2d 182, 191 (E.D.N.Y. 2002) ("[A]lthough plaintiff felt she had been treated unfairly, . . . [t]here simply is no basis in the record from which

a rational juror could find that the reasons given for plaintiff's termination . . . were false or a pretext for discrimination."); *Ricks v. Conde Nast Publ'ns., Inc.*, 92 F. Supp. 2d 338, 347 (S.D.N.Y. 2000) ("The mere fact that an employee disagrees with her employer's assessments of her work . . . cannot[,] standing on its own[,] show that her employer's asserted reason[s] for termination [were] pretextual." (internal citation omitted)); *see also D'Cunha v. N.Y. Hosp. Med. Ctr. of Queens*, No. 02 Civ. 5445 (DLI), 2006 WL 544470, at *6 (E.D.N.Y. Mar. 6, 2006). An "employer may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." *Nix v. WLCY Radio/Rahall Commc'ns*, 738 F.2d 1181, 1187 (11th Cir. 1984). Here, although plaintiff attempts to dispute aspects of her poor performance or provide explanations in certain instances for the poor performance, there is simply not a single piece of evidence that defendants' adverse employment actions were a pretext for race or age discrimination. Title VII and the ADEA do not confer on federal courts the authority to function as employment appeals boards for disputes about worker performance where, as here, there is simply no evidence that the employment decision at issue, whether correct or incorrect, was motivated by a discriminatory purpose.

With respect to plaintiff's third argument, the evidence in the record demonstrates that the number of audits each auditor completed varied from month to month and that at times plaintiff had more audits, and at times, plaintiff had fewer audits.[21] In addition, plaintiff's own 56.1 Statement of Additional Facts indicates that

---

[21] The Court notes that plaintiff argues elsewhere that an increased audit workload was actually a result of discriminatory animus. (Pl.'s Opp. at 10.)

Pruden, the employee who plaintiff trained, came to plaintiff for assistance, and when Pruden expressed that she was uncomfortable with a portion of the audit, Robbie offered to give that portion of the audit to another auditor. (Pl.'s 56.1 Statement of Additional Facts ¶ 63; Pl.'s Ex. 44, Email Chain dated January 8, 2008.) Plaintiff's involvement in assisting another employee does create a genuine issue of material fact as to whether the decision to terminate plaintiff was discriminatory.

With respect to plaintiff's claim that the termination was based on race, there is no evidence of racial comments or actions during the course of plaintiff's employment, or any other evidence that could remotely support an inference of race discrimination. The only time race was ever mentioned was in plaintiff's own comment to Robbie, and in Spera's notation of this conversation. Though plaintiff argues that Robbie favored White employees over her, the Court notes that John Morales, a co-worker who plaintiff alleges made mistakes similar to plaintiff's and was not disciplined, is classified by plaintiff as "non-white." (Pl.'s 56.1 Statement of Additional Facts ¶ 52.) Robbie also issued verbal warnings to two White employees, Conley and Pruden, in January 2009 and February 2009, respectively, for inadequate accuracy scores. (Spera Decl. ¶ 4.) Conley was terminated as part of a reduction-in-force in November 2011. (Spera Suppl. Decl. ¶ 3.) Pruden left Robbie's team in 2009, prior to the expiration date of the verbal warning issued by Robbie. (*Id.* ¶ 4.) Given this uncontroverted evidence, no rational jury could find that race discrimination motivated defendants' decision to terminate plaintiff.[22]

---

[22] In reaching this decision, the Court has also considered the arguments made by plaintiff with

With respect to plaintiff's claim that the termination was based on age, there is no evidence of comments or actions related to age during the course of plaintiff's employment, or any other evidence that could possibly support an inference of age discrimination. Again, the only time age was mentioned was in plaintiff's comment, and in Spera's notation of this conversation. When plaintiff was hired, she was over the age of fifty. Robbie supervised two other employees, Connie Shyrock and Conley, who, like plaintiff were born in 1952. (Spera Decl. ¶ 2.) Shyrock is five months older than plaintiff, and Conley is two months younger. (*Id.*) Pruden was fifty years old when she reported to Robbie, and two other employees were over the age of forty.[23] (*Id.*)

---

respect to establishing an inference of discrimination for plaintiff's *prima facie* case. (Pl.'s Opp. 9-13.) Plaintiff has produced no evidence that White co-workers were given additional guidance or training while she was not. With respect to Morales' alleged mistakes, as noted *supra*, plaintiff herself classifies Morales as "non-white." With respect to Conley's alleged poor performance and low 2008 performance review, the Court notes that plaintiff has not produced any admissible evidence of Conley's performance review or other performance assessments. Even assuming that Conley received a two on her 2008 performance review and was underperforming, Conley was issued a verbal warning and eventually terminated. Plaintiff's arguments and purported evidence do not create a disputed issue of fact with respect to these claims.

[23] In the supplemental submission, defendants also provided evidence that "between 2010 and 2011, Robbie had several employees reporting to her that were Plaintiff's age or were older than Plaintiff, including David Dillon (65 years old in 2010; White); Charles Bono (55 years old in 2010; White); and Barbara Parks (60 years old in 2010; White)." (Defendants' March 8, 2012 Letter, at 2, ECF No. 45.) According to the supplemental Declaration of Catherine Spera, none of these employees had any formal discipline in their personnel files from Robbie. (Spera Suppl. Decl. ¶ 6.) However, even without this supplemental declaration, the other uncontroverted facts (summarized *supra*) demonstrate that plaintiff's claims cannot survive summary judgment.

Plaintiff provides no evidence that younger employees not in the protected class were treated more favorably. Moreover, to the extent that plaintiff argues that her performance could have improved with more training (notwithstanding defendants' prior, unsuccessful efforts to correct her poor performance), an employer has no such obligation to provide training. *See, e.g.*, *Siano v. Haber*, 40 F. Supp. 2d 516, 524 (S.D.N.Y. 1999) ("While employers are required under the ADEA to treat employees in a neutral fashion, they are not required to spend more time and effort training an employee over forty than they would spend training anyone else."). In short, even construing the record in the light most favorable to plaintiff, no rational jury could find that age discrimination motivated defendants' decision to terminate plaintiff.

\*     \*     \*

Accordingly, the Court grants summary judgment with respect to plaintiff's Title VII and Section 1981 race discrimination claims, as well as plaintiff's ADEA claim.

### B.  Plaintiff's Retaliation Claims

### 1.  Legal Standard

The *McDonnell Douglas* burden shifting analysis also applies to plaintiff's retaliation claims based on Title VII and the ADEA. *See Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003) ("The *McDonnell Douglas* burden shifting analysis used in claims of discrimination in violation of Title VII also applies to retaliation claims brought pursuant to Title VII. . . . The same standards and burdens apply to claims of retaliation in violation of the ADEA." (citations omitted)).

Under Title VII, it is unlawful "for an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a).  To establish a *prima facie* case of retaliation, a plaintiff must show (1) she engaged in a protected activity; (2) defendant was aware of that activity; (3) she suffered an adverse employment action; and (4) there was a causal connection between the protected activity and the adverse employment action. *Distasio v. Perkin Elmer Corp.*, 157 F.3d 55, 66 (2d Cir. 1998); *see Terry v. Ashcroft*, 336 F.3d 128, 141 (2d Cir. 2003).  An employment action is considered adverse if "the employer's actions . . . could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006).

Under this framework, "[a] plaintiff must establish a prima facie case; the employer must offer through the introduction of admissible evidence a legitimate non-discriminatory reason for the [adverse action]; and the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason is a pretext." *Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006) (citing *Heyman v. Queens Vill. Comm. for Mental Health for Jamaica Cmty. Adolescent Program, Inc.*, 198 F.3d 68, 72 (2d Cir. 1999)).  "Title VII is violated when 'a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause.'" *Terry*, 336 F.3d at 140-41 (internal citations omitted).

As noted above, it is well settled that if a retaliatory motive played a part in the adverse employment actions, even if it was not the sole cause, the law is violated. *Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) (citing *Davis v. State Univ. of N.Y.*, 802 F.2d 638, 642 (2d Cir.

1986)); *De Cintio v. Westchester Cnty. Med. Ctr.*, 821 F.2d 111, 116 n.8 (2d Cir. 1987). Likewise, if the employer was at all motivated by retaliatory animus, the law is violated even if there were objectively valid grounds for the adverse employment action. *Sumner*, 899 F.23d at 209. A plaintiff may establish a causal connection between the protected activity and the adverse employment action either through direct evidence of retaliatory animus, or by circumstantial evidence. *Id*.

### 2. Application

Defendants contend that plaintiff cannot establish a *prima facie* case of retaliation because (1) plaintiff did not engage in protected activity, (2) several of the alleged adverse employment actions are not sufficiently adverse as a matter of law,[24] and (3) there is no causal connection between the alleged protected activity and the adverse employment actions. (Defs.' Br. at 20-25.) The Court agrees that plaintiff cannot establish a *prima facie* case of retaliation. The Court also concludes that, even if plaintiff could establish a *prima facie* case, defendants have set forth legitimate, non-discriminatory reasons for plaintiff's termination, and no rational jury could conclude that these reasons are pretextual based upon the record in this case, even construing it most favorably to plaintiff.

### a. Failure to Establish a *Prima Facie* Case

The Court concludes that plaintiff cannot establish a *prima facie* case of retaliation

---

[24] In plaintiff's opposition papers, plaintiff focuses on the following alleged adverse employment actions: (1) a reduced bonus, (2) Spera's presentation of a separation agreement, (3) the 100% re-audit, (4) probation, and (5) termination. (Pl.'s Opp. at 21-22.) The Court considers these to be the alleged adverse employment actions with respect to the retaliation claim.

because plaintiff cannot demonstrate a causal connection between the protected activity and the adverse employment actions alleged.

A plaintiff may establish a causal connection between the protected activity and the adverse employment action either through direct evidence of retaliatory animus or by circumstantial evidence. *See Sumner v. U.S. Postal Serv.*, 899 F.2d 203, 209 (2d Cir. 1990) (holding that a causal connection may be "established indirectly with circumstantial evidence, for example, by showing that the protected activity was followed by discriminatory treatment or through evidence of disparate treatment of employees who engaged in similar conduct or directly through evidence of retaliatory animus"). Where there is no direct evidence of retaliatory animus or a showing of disparate treatment of fellow employees who engaged in the same conduct, proof of causation may be shown indirectly, by demonstrating that the protected activity was followed closely by a retaliatory action. *Gordon v. N.Y. City Bd. of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000); *Cifra v. Gen. Elec. Co.*, 252 F.3d 205, 217 (2d Cir. 1991) ("[T]he causal connection needed for proof of a retaliation claim 'can be established indirectly by showing that the protected activity was closely followed in time by the adverse action.'" (quoting *Reed v. A.W. Lawrence & Co.*, 95 F.3d 1170, 1178 (2d Cir. 1996) (internal quotation marks omitted))). Although the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action[,]" *Gorman-Bakos v. Cornell Coop. Extension*, 252 F.3d 545, 554 (2d Cir. 2001), some district courts have generally concluded that "a passage of two months between the protected activity and

the adverse employment action seems to be the dividing line." *Cunningham v. Consol. Edison, Inc.*, No. 03 Civ. 3522 (CPS), 2006 WL 842914, at *19 (E.D.N.Y. Mar. 28, 2006) (collecting cases). However, because the Second Circuit has found periods well beyond two months to be sufficient to suggest a causal relationship under certain circumstances, courts must carefully consider the time lapse in light of the entire record. *See, e.g.*, *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45-46 (2d Cir. 1980) (holding eight-month gap between EEOC complaint and retaliatory action suggested a causal relationship); *see also Richardson v. N.Y. State Dep't of Corr. Serv.*, 180 F.3d 426, 446-47 (2d Cir. 1999), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006) (holding abusive acts within one month of receipt of deposition notices may be retaliation for initiation of lawsuit more than one year earlier). In determining whether a plaintiff has satisfied this initial burden, the Court's role in evaluating a summary judgment request is "to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." *Jute v. Hamilton Sunstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005).

Plaintiff has not produced direct evidence of retaliatory animus or made a showing of disparate treatment of fellow employees who engaged in the same conduct. Instead, plaintiff attempts to simply rely on temporal proximity between the protected speech and the alleged retaliatory action. Plaintiff's only alleged complaints of age and race discrimination occurred during her October 23, 2007 conversation (the "October 23 conversation") with Robbie and her July 17, 2008 EEOC charge. Although plaintiff made other complaints regarding her treatment by Robbie, none of these complaints referenced race or age

discrimination, and are not protected activity under the relevant statutes. *See Aspilaire v. Wyeth Pharmas., Inc.*, 612 F. Supp. 2d 289, 308 (S.D.N.Y. 2009) ("mere complaints of unfair treatment by an individual are not protected speech").

Plaintiff's first alleged retaliatory activity, the reduced bonus, occurred in April 2008, over five months after plaintiff's October 23 conversation with Robbie.[25] The other alleged adverse employment actions occurred on July 2, 2008 (the separation agreement offer and probation), December 2008 (the 100% re-audit), and August 2009 (plaintiff's termination). Consistent with other courts in this Circuit, this Court concludes that, in light of the whole record, plaintiff has not established a causal connection due to the documented problems with plaintiff's performance and the lengthy

---

[25] In her opposition papers, plaintiff alleges that the reduced bonus occurred weeks after plaintiff's counsel "contacted Defendants re-stating Plaintiff's continuous complaints of discrimination and retaliation due to race and age." (Pl.'s Opp. 19.) Although the opposition specifically refers to a letter, the letter is not contained in the record, and plaintiff's only evidence of this complaint is plaintiff's declaration, in which plaintiff states that, on April 4, 2008, she had her attorneys "contact Zurich to make a formal complaint on my behalf that I was being held to different standards and expectations in comparison to [her] White co-workers." (Robinson Decl. § 26.) It is unclear what plaintiff's counsel actually said to defendants, and whether or not plaintiff's counsel actually complained of race or age discrimination. In any event, by April 2008, plaintiff had already been placed on a development plan and cautioned regarding her communication skills, and plaintiff had received a verbal warning and a score of two, or partially meets expectations, on her performance review. As the Second Circuit has noted, "[w]here timing is the only basis for a claim of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in any protected activity, an inference of retaliation does not arise." *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001). As such, the alleged April 4, 2008 letter and the subsequent reduced bonus cannot create an inference of retaliation.

lapses of time between the October 23 conversation and the alleged retaliatory actions, namely the over five-month lapse between the October 23 conversation and the April 2008 bonus, the over eight-month lapse between the October 23 conversation and the July 2, 2008 separation agreement and probation, the over thirteen-month lapse between the October 23 conversation and the December 2008 100% re-audit, and the nearly two-year lapse between the October 23 conversation and plaintiff's termination in August 2009. *See Jackson v. N.Y.S. Office of Mental Health*, No. 11 Civ. 7832(GBD)(KNF), 2012 WL 3457961, at *11 (S.D.N.Y. Aug. 13, 2012) ("Generally, courts in this circuit have held that the temporal nexus between the protected activity and the adverse employment action must be three months or less to establish a causal connection." (collecting cases)).

With respect to plaintiff's July 17, 2008 EEOC charge, the only adverse events following the charge were the 100% re-audit and plaintiff's termination. By the time plaintiff filed her EEOC charge, the defendants had already implemented various forms of discipline against plaintiff, including placement on a development plan, directives regarding communication skills, a verbal warning, a low performance evaluation, and probation. Where, as here, gradual adverse actions began well in advance of the alleged protected conduct, an inference of discrimination does not arise from plaintiff's filing of the EEOC charge. *See Slattery*, 248 F.3d at 95.

### b. Failure to Establish Pretext

Even assuming that plaintiff's *prima facie* case of retaliation could be established by temporal proximity, the defendants have articulated legitimate, non-discriminatory reasons for plaintiff's termination, and "temporal proximity is insufficient to satisfy

[plaintiff's] burden to bring forward some evidence of pretext." *El Sayed v. Hilton Hotels Corp.*, 627 F.3d 931, 933 (2d Cir. 2010). Plaintiff must "come forward with some evidence of pretext in order to raise a triable issue of fact. *Id.* As discussed in great detail *supra*, plaintiff has failed to produce evidence from which a rational jury could conclude that defendants' proffered reasons are pretext for retaliatory animus. Thus, plaintiff's retaliation claims cannot survive summary judgment.

### C.  Plaintiff's Hostile Work Environment Claims[26]

#### 1.  Legal Standard

Under Title VII, a hostile work environment is established by a plaintiff showing that his workplace was "permeated with 'discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Howley v. Town of Stratford*, 217 F.3d 141, 153 (2d Cir. 2000) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)); *accord Terry v. Ashcroft*, 336 F.3d 128, 147-48 (2d Cir. 2003). "Isolated instances of harassment ordinarily do not rise to this level." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 570 (2d Cir. 2000); *Petrisch v. JP Morgan Chase*, 789 F. Supp. 2d 437, 451 (S.D.N.Y. 2011) (same).

The conduct in question must be "severe or pervasive enough to create an objectively hostile or abusive work environment, and

---

[26] The Court notes that, in the opposition papers, plaintiff devotes six sentences to the hostile work environment claims, and treats those claims in a cursory manner.  In any event, the Court has carefully analyzed the record and concludes that there is no evidence to support a hostile work environment claim.

the victim must also subjectively perceive that environment to be abusive." *Feingold v. New York*, 366 F.3d 138, 150 (2d Cir. 2004) (quotation marks omitted). In addition, a plaintiff seeking to establish a hostile work environment claim must demonstrate that "a specific basis exists for imputing the objectionable conduct to the employer." *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002) (quotation marks omitted). Other factors to consider include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Terry*, 336 F.3d at 148. The Second Circuit has noted, however, that "[w]hile the standard for establishing a hostile work environment is high, . . . . [t]he environment need not be 'unendurable' or 'intolerable.'" *Id.* (quoting *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 70 (2d Cir. 2000)). Moreover, although a hostile work environment generally consists of "continuous and concerted" conduct, "a single act can create a hostile work environment if it in fact work[s] a transformation of the plaintiff's workplace." *Feingold*, 366 F.3d at 150 (quotations marks omitted).

Further, to succeed on a hostile work environment claim in the instant case, plaintiff must link the actions by defendants to her race or age. Although "[f]acially neutral incidents may be included, of course, among the 'totality of the circumstances' that courts consider in any hostile work environment claim," *Alfano*, 294 F.3d at 378, plaintiff nevertheless must offer some evidence from which a reasonable jury could infer that the facially neutral incidents were in fact discriminatory. *See Richardson v. New York State Dep't of Corr. Serv.*, 180 F.3d 426, 440 (2d Cir. 1999), *abrogated on other grounds*, ("But to sustain a Title VII

hostile environment claim [plaintiff] must show more – she must produce evidence that she was discriminated against because of her race, and this she has not done."); *see also Alfano v. Costello*, 294 F.3d 365, 378 (2d Cir. 2002) (requiring "some circumstantial or other basis for inferring that incidents sex-neutral on their face were in fact discriminatory.").

The standard under Title VII is applicable to hostile work environment claims under the ADEA. *See, e.g.*, *Terry v. Ashcroft*, 336 F.3d 128, 148 (2d Cir. 2003) ("The same standards apply to hostile work environment claims brought under the ADEA.").

### 2. Application

In a conclusory fashion, plaintiff argues that "Robinson was harassed on a continual basis: she was assigned tasks without training or with incorrect manuals, subject to high scrutiny, resulting in inaccurate and unfair performance assessments, denied vacation time, subject to substantial lost income, and a workload that was both unmanageable and substantially higher than her peers." (Pl.'s Opp. at 25.)

With respect to these claims, plaintiff has put forth no evidence from which a rational jury could conclude that her workplace was "permeated with 'discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Howley*, 217 F.3d at 153 (quoting *Harris*, 510 U.S. at 21). In addition, these events are facially-neutral, work-related conduct, and plaintiff has offered no evidence from which a rational jury could infer that these facially-neutral actions were discriminatory. In other words, plaintiff has not provided any evidence that

would provide a circumstantial basis, or any other basis, for a rational jury to infer that the race-neutral and age-neutral conduct alleged was discriminatory. Plaintiff has simply not shown, through evidence of race or age related comments or actions, or through evidence of other similarly situated co-workers who were not subjected to the same conduct, or through any other evidence, how the alleged conduct was discriminatory based on plaintiff's race or age.[27]

*     *     *

In sum, the Court recognizes that it must proceed with great caution in granting summary judgment in discrimination cases where intent, as drawn from inferences, is a core issue. However, as the Second Circuit has noted, "[t]o allow a party to defeat a motion for summary judgment by offering

purely conclusory allegations of discrimination, absent any concrete particulars, would necessitate a trial in all [discrimination] cases." *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985). That is precisely the situation here. It is the quality of the evidence that plaintiff relies upon to support his or her claim, not the quantity of the evidence. Here, although plaintiff points to a wide array of irrelevant facts or facts with no support in the record, and also makes conclusory assertions based upon sheer speculation, the bottom line remains the same – that is, no rational jury could find discrimination or retaliation under federal law in this particular case.

D. New York State Claims

Plaintiff's complaint also asserts causes of action under New York State law. Having determined that the federal claims do not survive summary judgment, the Court concludes that retaining jurisdiction over any state law claims is unwarranted. 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). "In the interest of comity, the Second Circuit instructs that 'absent exceptional circumstances,' where federal claims can be disposed of pursuant to Rule 12(b)(6) or summary judgment grounds, courts should 'abstain from exercising pendent jurisdiction.'" *Birch v. Pioneer Credit Recovery, Inc*., No. 06-CV-6497T, 2007 WL 1703914, at *5 (W.D.N.Y. June 8, 2007) (quoting *Walker v. Time Life Films, Inc.,* 784 F.2d 44, 53 (2d Cir. 1986)).

Therefore, in the instant case, the Court, in its discretion, "'decline[s] to exercise supplemental jurisdiction'" over plaintiff's state law claims because "it 'has dismissed all claims over which it has original jurisdiction.'" *Kolari v. N.Y.-Presbyterian Hosp*., 455 F.3d 118, 122 (2d Cir. 2006) (quoting 28 U.S.C. § 1367(c)(3)); *see also*

---

[27] In addition, the Court notes that the record does not even support plaintiff's factual contentions with respect to the facially-neutral conduct. With respect to the improper manuals, nothing in the record suggests that Robbie, Kostkowski, or any supervisor was aware that plaintiff was given the wrong manual, and as such, there is an insufficient basis for imputing this conduct to Robbie or Zurich. With respect to the claim of an increased workload, as noted *supra*, the record indicates that at times plaintiff had more audits to complete than her co-workers, and at times she had fewer. The Court notes that plaintiff argues that when audits were taken away from plaintiff to provide her with more time to complete her audits (Robbie Decl. Ex. W, Email Memo to File dated March 21, 2008; Robbie Decl. Ex. K, Email dated April 9, 2008), this reduction in workload was also discriminatory. (Pl.'s 56.1 Statement of Additional Facts ¶ 103.) With respect to plaintiff's claim that she was denied vacation, this claim is simply false based upon the uncontroverted record. Plaintiff was allowed to take her planned vacation despite the fact that she had not requested the time off from Robbie. Finally, with respect to the lower bonus in 2007, there is no evidence to controvert Robbie's statement that she played no role in determining the amount of money plaintiff received as a bonus. (Walker Suppl. Decl. Ex. E, Interrogatory Reponses.)

*Cave v. E. Meadow Union Free Sch. Dist.*, 514 F.3d 240, 250 (2d Cir. 2008) ("We have already found that the district court lacks subject matter jurisdiction over appellants' federal claims. It would thus be clearly inappropriate for the district court to retain jurisdiction over the state law claims when there is no basis for supplemental jurisdiction."); *Karmel v. Claiborne, Inc.*, No. 99 Civ. 3608 (WK), 2002 WL 1561126, at *4 (S.D.N.Y. July 15, 2002) ("Where a court is reluctant to exercise supplemental jurisdiction because of one of the reasons put forth by § 1367(c), or when the interests of judicial economy, convenience, comity and fairness to litigants are not violated by refusing to entertain matters of state law, it should decline supplemental jurisdiction and allow the plaintiff to decide whether or not to pursue the matter in state court.").

Accordingly, pursuant to 28 U.S.C. § 1367(c)(3), the Court declines to retain jurisdiction over the remaining state law claims given the absence of any federal claims that survive summary judgment and dismisses such state claims without prejudice.

IV. CONCLUSION

For the foregoing reasons, the Court grants defendants' motion for summary judgment in its entirety with respect to the federal claims. The Court declines to exercise supplemental jurisdiction over the state law claims, and dismisses the state law claims without prejudice. The Clerk of the Court shall enter judgment accordingly and close the case.

SO ORDERED.

_____
JOSEPH F. BIANCO
United States District Judge

Dated: September 21, 2012
        Central Islip, NY

* * *

Plaintiff is represented by Aneeba Rehman, James Aldo Vagnini, and Robert John Valli, Valli, Kane & Vagnini, 600 Old Country Road, Suite 519, Garden City, NY 11530. The attorneys for the defendants are Lori M. Myers and Peter Arnold Walker, Seyfarth Shaw, 620 Eighth Avenue, New York, NY 10018.